## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES M. MANNING, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>EIDP, INC. f/k/a E.I. du Pont de Nemours and Company, THE ADMINISTRATION COMMITTEE OF THE DUPONT PENSION AND RETIREMENT PLAN and JOHN/JANE DOES 1-5,<br><br>Defendants. | Civil Action No.:<br><br><br><br>**CLASS ACTION COMPLAINT** |

Plaintiff, James M. Manning, through his attorneys, on behalf of himself and all others similarly situated, alleges:

## <u>INTRODUCTION</u>

1.     This is a class action against EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company ("DuPont"), the Administrative Committee of the DuPont Pension and Retirement Plan (the "Committee") and the Committee's members (collectively, "Defendants") concerning their failures to pay benefits to participants that select Spousal Benefit Options ("SBO") under Title I of the DuPont Pension and Retirement Plan (the "Plan") in amounts that satisfy the actuarial equivalence requirements in Section 205 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA").

1

2.      DuPont sponsors the Plan.  Under Title I of the Plan, participants earn pension benefits in the form of a single life annuity ("SLA").  An SLA provides participants with monthly payments for the rest of their lives when they retire.

3.      Participants can also select an SBO, which is the Plan's terminology for a joint and survivor annuity.  A joint and survivor annuity provides monthly payments for the participant's life with a contingent annuity payable to the participant's spouse for the rest of the spouse's life.  Joint and survivor annuities are expressed as a percentage of the amount paid during the participant's life.  The Plan offers a 50% and 75% SBO and allows participants to select a survivorship percentage of up to 100%.

4.      The monthly benefit payable as a joint and survivor annuity, regardless of the percentage, will be less than the amount payable as an SLA because a joint and survivor annuity accounts for the likelihood that the Plan will have to pay benefits for a longer period if a participant dies before the spouse.  ERISA limits the extent to which a plan can reduce a participant's joint and survivor annuity benefits below a participant's SLA benefits. Under ERISA § 205(d), joint and survivor annuities between 50% and 100% must be at least the actuarial equivalent of the participant's SLA.  Two benefit options are actuarially equivalent when they have the same present value, calculated using the same, reasonable actuarial assumptions.

5.      Calculating present value requires using actuarial assumptions concerning projected mortality and interest rates.  Mortality tables for the participant (and, in the case of a JSA, the participant's beneficiary) predict how long the participant and beneficiary will live to account for the likelihood of each future benefit payment being made.  Over

the last several decades, mortality rates have generally improved with advances in medicine and better collective lifestyle habits.  People who retired recently are expected to live longer than those who retired in previous generations.  Older mortality tables predict that people near (and after) retirement age will die at a faster rate than current mortality tables.  As a result, using an older mortality table decreases the present value of a joint and survivor annuity and — interest rates being equal — the monthly payments retirees receive.

6.     The interest rate assumption accounts for the time value of money — the idea that a dollar in hand today is worth more than a dollar paid in a year, or in ten years — and discounts the value of expected future payments to the present.  Like mortality, the interest rate affects the calculation.  Using lower interest rates — mortality rates being equal — decreases the present value of a joint and survivor annuity.

7.     To determine the amount of a benefit, mortality and interest rate assumptions, *together*, generate a "reduction factor," which is expressed as a percentage of the benefit being compared.  The actuarial assumptions used to generate the reduction factor directly impact the monthly benefit amounts that participants and their spouses receive. If a plan's reduction factor is greater than the one generated using reasonable mortality and interest rate assumptions, then the resulting joint and survivor annuity payments will be too low and will not be "actuarially equivalent" to the SLA.  Accordingly, the reduction factor (and the actuarial assumptions used to generate it) determine whether two benefit forms are actuarially equivalent.

8.     The reduction factors that Defendants apply to calculate SBOs are excessive, reducing participants' benefits below an actuarially equivalent amount.   The  Plan's

3

reduction factors are consistent with factors produced by the 1971 GAM mortality table, which used mortality date from the 1960s.  Indeed, the Plan defines "actuarial equivalence" as the benefit calculated using the "1985 DuPont Pensioner Mortality Table."

9.     At bottom, Defendants reduce participants' benefits by too much when they select an SBO, resulting in participants receiving monthly payments that are materially *lower* than they would be if Defendants used reduction factors based on up-to-date, reasonable actuarial assumptions. In sum, Defendants are causing Plaintiff and Class Members to receive lower pension benefits than they should each month, a harm that will affect them throughout their retirements.

10.     Accordingly, Plaintiff seeks an order from the Court (1) declaring that the Plan's formula used to determine SBO benefits produces benefits that are less than the actuarial equivalent of the SLA offered to participants; (2) requiring Defendants to pay all amounts improperly withheld in the past and to be withheld in the future; (3) requiring Defendants to recalculate Plaintiff's SBO benefits in a manner consistent with ERISA's actuarial equivalence requirements; (4) requiring Defendants to increase the amounts of Plaintiff's future benefit payments; and (5) such other relief as the Court determines to be just and equitable.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

12.     This Court has personal jurisdiction over Defendants because they transact business in, or reside in, and have significant contacts with this District, and because ERISA provides for nationwide service of process. DuPont is headquartered in this District, and, upon information and belief, the Committee and its members are also based in, and can be found in, this District.

13.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because DuPont does business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

### Plaintiff

14.     Plaintiff James M. Manning is a Plan participant who worked for DuPont for over 40 years.  Mr. Manning is receiving his Plan benefits as a SBO.

### Defendants

15.     Defendant EIDP, Inc. ("DuPont") is a corporation formed under Delaware law with its principal place of business in Wilmington, Delaware.  Until changing its name on January 1, 2023, DuPont formerly known as E.I. du Pont de Nemours and Company. DuPont is a wholly owned subsidiary of Corteva, Inc. As alleged below, DuPont is a fiduciary of the Plan.

16.     Defendant the Administrative Committee a/k/a the Benefits Plans Administrative Committee is an unincorporated association with a principal place of business in Wilmington, Delaware.  The Committee is the Plan's named fiduciary and the Plan Administrator within the meanings of ERISA §§ 402(a)(2) and 3(16)(A), 29 U.S.C. §§1102(a)(2) and 1002(16)(A).

17.     The Committee "control[s] and manage[s] the operation of the Plan and administer[s] the Plan."  Plan, Title I at § 2. As such, they are fiduciaries of the Plan.

18.     John/Jane Does 1-5 are the individual members of the Committee responsible for administrating the Plan during the Class Period.  Their names and identities are not currently known.  Members of the Committee are appointed by, and can be removed by, DuPont's Director of Global Rewards.

## APPLICABLE ERISA REQUIREMENTS

### *Pension Benefit Options Must Be Actuarially Equivalent*

19.     ERISA requires that defined benefit plans pay married participants and their beneficiaries in the form of a "qualified joint and survivor annuity" (a "QJSA") unless the participant, with the consent of his or her spouse, elects an alternative form of payment. This makes the QJSA the default benefit for employees who are married.  ERISA § 205(a) and (b), 29 U.S.C. § 1055(a) and (b).

20.     ERISA defines a QJSA as an annuity for the life of the participant with a survivor benefit for the life of the spouse that is not less than 50%, and not greater than 100% of the annuity payable during the joint lives of the participant and the spouse.  ERISA § 205(d)(1), 29 U.S.C. § 1055(d)(1).  A QJSA includes "any annuity in a form having the

effect of an annuity" described in ERISA § 205(d)(1).  *Id.*  Accordingly, a plan can offer multiple QJSA options; that is, JSAs that pay survivor benefits between 50% to 100%. *Id.* A QJSA must be actuarially equivalent to an SLA.  *Id.*

21.     If a plan offers more than one joint and survivor annuity with a survivor percentage between 50 and 100 percent, the plan must designate one to be the default form for married participants.  26 C.F.R. § 1.401(a)-20, Q&A 16.   But a plan may allow a married participant to choose any non-default, joint and survivor annuity that has the same present value as the designated QJSA without the consent of the participant's spouse.  *Id.* ("For example, if a plan designates a joint and 100% survivor annuity as the QJSA and also offers an actuarially equivalent joint and 50% survivor annuity….the participant may elect the joint and 50% survivor annuity without spousal consent.").

22.     Pension plans must also offer participants at least one other form of survivor annuity, known as a qualified optional survivor annuity ("QOSA").  ERISA § 205(d)(2), 29 U.S.C. § 1055(d)(2).  A QOSA is similar to a QJSA, except that the survivor annuity percentage under a QOSA must be: (a) greater than 75% if the QJSA's survivor annuity percentage is less than 75%; and (b) 50% if the QJSA's survivor annuity percentage is greater than 75%.  The definition of a QOSA includes "any annuity in a form having the effect of an annuity" described in ERISA § 205(d)(2).  ERISA requires that QOSAs be actuarially equivalent to an SLA.  ERISA § 205(d)(2)(A)(ii), 29 U.S.C. § 1055(d)(2)(A)(ii).

23.     Reorganization Plan No. 4 of 1978 transferred authority to the Secretary of the Treasury to issue regulations for several provisions of ERISA, including § 205, which

concerns alternative forms of benefits.  *See* 92 Stat. 3790 (Oct. 17, 1978), codified at 29 U.S.C. § 1001.

24.     The Treasury regulations for the Internal Revenue Code (the "Tax Code") provision corresponding to ERISA § 205 (26 U.S.C. § 401(a)(11)) provide that a QJSA "must be at least the actuarial equivalent of the normal form of life annuity or, if greater, of any optional form of life annuity offered under the plan." 26 C.F.R. § 1.401(a)-11(b)(2). Indeed, a QJSA "must be as least as valuable as any other optional form of benefit under the plan at the same time." 26 C.F.R. § 1.401(a)-20 Q&A 16.  Accordingly, if a plan offers other benefit options that are more valuable than the SLA, the QJSA must be at least as valuable as the most valuable form of those benefit options. The regulations regarding QJSAs apply "when the participant attains the earliest retirement age under the plan."  26 C.F.R. § 1.401(a)-20 Q&A 17.

25.     ERISA does not require that pension plans offer lump sum distributions of vested benefits to retirees upon their retirement.  *See* ERISA § 205(g), 29 U.S.C. § 1055(g). But if they do, ERISA § 205(g)(3), 29 U.S.C. § 1055(g)(3), requires that the present value of the lump sum be at least equal to the present value of the participant's benefits determined using the applicable mortality table (the "Treasury Mortality Table")[1] and applicable interest rates (the "Treasury Interest Rate")[2] (collectively, the "Treasury Assumptions"). The Treasury Assumptions are set by the Secretary of the Treasury (the "Secretary") pursuant to IRC §§ 417(e) and 430(h) and are based on current market rates

---

[1] 26 C.F.R. § 1.430(h)(2)-1.
[2] 26 C.F.R. § 1.430(h)(3)-1.

and mortality assumptions.  *See* 29 U.S.C. § 1055(g)(3)(B); 29 U.S.C. § 1083(h), 26 U.S.C. §§ 417(e) and 430(h).

26.     ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an employee's right to the vested portion of his or her normal retirement benefit is non-forfeitable.  The Treasury regulation for the Tax Code provision corresponding to ERISA § 203 (26 U.S.C. § 411), states that "adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable."  26 C.F.R. § 1.411(a)-4(a).

### *Reasonable Factors Must Be Used When Calculating Actuarial Equivalence*

27.     "Two modes of payment are actuarially equivalent when ***their present values are equal*** under a given set of assumptions."  *Stephens v. US Airways Group, Inc.*, 644 F.3d 437, 440 (D.C. Cir. 2011) (emphasis added) (citing Jeff L. Schwartzmann & Ralph Garfield, Education and Examination Comm. of the Society of Actuaries, Actuarially Equivalent Benefits 1, EA1-24-91 (1991) ("Schwartzmann & Garfield").[3]

28.     Under ERISA, "present value" must "reflect anticipated events."  Present value adjustments "shall conform to such regulations as the Secretary of the Treasury may prescribe."  ERISA § 3(27), 29 U.S.C. § 1002(27). The Secretary has prescribed several Regulations describing how present value should reasonably reflect anticipated events, including:

---

[3] According to Merriam Webster: "Equivalent" means "equal." *See* https://www.merriam-webster.com/dictionary/equivalent. "Equal" means the "same." https://www.merriam-webster.com/dictionary/equal

(a)      The Regulation concerning QJSAs provides that "[e]quivalence may be determined, on the basis of consistently applied ***reasonable actuarial factors***, for each participant or for all participants or reasonable groupings of participants." 26 C.F.R. § 401(a)-11(b)(2) (emphasis added).

(b)      A plan must determine optional benefits using "a single set of ***interest and mortality assumptions that are reasonable*** . . . ." 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv) (emphasis added).

(c)      The term actuarial present value means "actuarial present value (within the meaning of § 1.401(a)(4)-12) determined using ***reasonable actuarial assumptions***." 26 C.F.R. §1.411(d)-3(g)(1) (emphasis added).

(d)      With respect to benefits under a lump sum-based formula, any optional form of benefit must be "at least the actuarial equivalent, using ***reasonable actuarial assumptions*** . . . ." 26 C.F.R. § 1.411(a)(13)-1(b)(3) (emphasis added).

29.    The Regulations also rely on the standards of the Society of Actuaries (the "SOA") for determining the present value of pension liabilities. *See, e.g.,* 26 C.F.R. § 1.430(h)(3)-1(a)(2)(C); IRS Notices: 2008-85, 2013-49, 2015-53, 2016-50, 2018-02; 82 Fed. Reg. 46388-01 (Oct. 5, 2017) ("Mortality Tables for Determining Present Value Under Defined Benefit Plans"), 72 Fed. Reg. 4955-02 (Feb. 2, 2007) ("Updated Mortality Tables for Determining Current Liability").

30.    Like the Regulations and ERISA's definition of "present value," the Actuarial Standards of Practice ("ASOPs") issued by the Actuarial Standards Board

("ASB")[4] of the American Academy of Actuaries (the "Academy"),  require actuaries  to use "reasonable assumptions."   ASOP No. 27, § 3.6 ("each economic assumption used by an actuary should be reasonable"); *see also* ASOP No. 35, § 3.3.5 ("Each demographic assumption selected by the actuary should be reasonable").

31.    Courts interpreting ERISA's actuarial equivalence requirements when calculating benefits have stated that "***special attention must be paid to the actuarial assumptions underlying the computations***."   *Pizza Pro Equip. Leasing v. Comm. of Revenue*, 147 T.C. 394, 411 (emphasis added), *aff'd,* 719 Fed. Appx. 540 (8th Cir. 2018). As the Ninth Circuit stated in *McDaniel v. Chevron Corp.*:

> The most important consideration in preparing and selecting a mortality table to be used in calculating pension benefits is whether the population from whom the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants.

203 F.3d 1099, 1110 (9th Cir. 2000)

32.    The court explained in *Dooley v. Am. Airlines, Inc.* that each assumption used in an actuarial equivalence determination must be reasonable:

> When the terms of a plan subject to ERISA provide that plan participants may opt to receive their accrued pension benefits in forms other than as a single life annuity, the amount payable to the plan participant under such circumstances must be "actuarially equivalent" to the participant's accrued benefits when calculated as a single life annuity.  The term actuarially equivalent means equal in value to the present value of normal retirement benefits,

---

[4] The ASB is an independent entity created by the Academy in 1988 that serves as the single board promulgating standards of practice for the entire actuarial profession in the United States.  The ASB was given sole authority to develop, obtain comment upon, revise, and adopt standards of practice for the actuarial profession.

> *determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate.*

*Dooley v. Am. Airlines, Inc.*, 1993 WL 460849, at * 10 (N.D. Ill. Nov. 4, 1993) (emphasis added); *see also Dooley v. Am. Airlines, Inc.*, 797 F.2d 1447, 1453 (7th Cir. 1986) (citing expert testimony that "actuarial equivalence must be determined on the basis of reasonable actuarial assumptions.").

32.     Actuarial equivalence should be "cost-neutral," meaning that neither the plan nor participants should be better or worse off if participants select a particular form of benefit. *Bird v. Eastman Kodak Co.*, 390 F.Supp.2d 1117, 1118–19 (M.D. Fla. 2005).

33.     "Periodically, the assumptions used [for actuarial equivalence] must be reviewed and modified so as to insure that they continue to fairly assess the cost of the optional basis of payment." Schwartzmann & Garfield at 11; *see also Smith v. Rockwell Automation*, No. 19-CV-0505, 2020 WL 620221, * 7 (E.D. Wisc. Jan. 10, 2020) ("plans must use the kind of actuarial assumptions that a reasonable actuary would use at the time of the benefit determination.").

## SUBSTANTIVE ALLEGATIONS

**I.      The Plan**

**A.      Overview**

33.     The Plan is a defined benefit plan which covers eligible employees of DuPont and its affiliates.  The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined benefit plan" within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).

34.     The Plan is divided into seven parts, which DuPont calls "Titles." Each Title has its own benefit formula that applies to a specific group of DuPont employees. For example, Title V is for former participants in the Danisco Pension Plan, which merged into the Plan.  This case is about Title I of the Plan, which is entitled "Benefits for Persons Employed By E.I. du Pont de Nemours and Company" ("Title I").

35.     Under Title I, participants earn pension benefits in the form of a monthly benefit payable for their lives, a single life annuity ("SLA"), beginning at age 65.  Plan, Title I at § IV.A(2), § IX.B and § III.  The amount of participants' age-65 SLA is based on their average monthly compensation and years of service, among other factors.  *Id*. at § IV.A(2).

36.     Participants may also receive their Plan benefits as a "Spousal Benefit Option" (SBO), which is DuPont's terminology for a joint and survivor annuity. The Plan offers SBOs that provide total survivor percentages of 50 and 75.  Plan, Title I at §§ VI.(D) and (E).

37.     All participants with more than 15 years of service also earn a separate company-paid survivor benefit ("CPSB").  Plan, Title I at §§ VI.A(1) and (2).  A CPSB is a monthly survivor benefit paid to a participant's designated beneficiary after the participant's death.  SPD at 12.  The amount of participants' CPSB is determined using their average monthly compensation through December 31, 2007 and years of service, among other factors.  Plan, Title I at § VI.A.

38.     Participants can designate their spouses, minor children or parents as beneficiaries of the CPSB.

39.     The CPSB is payable in addition to all of the other the benefit options offered in Title I, including an SLA or an SBO.

40.     Payments to the surviving spouse provided by the SBO are ***in addition to*** any amounts payable under the participant's CPSB.  The SPD provides:

> Under the post-retirement [SBO], your spouse receives a lifetime monthly payment beginning at the time of your death.  When this payment is ***added*** to the payment provided under the [CPSB], the total spouse benefit is at least equal to the payment amount required by law.

SPD at 17 (emphasis added).

41.     As the Plan makes clear, the payments to the surviving spouse under these SBO options represent "a combination of the survivor payment in accordance with [the Plan's CPSB provisions] and a monthly payment to the spouse equal to a percentage of the employee's pension. . . ."  Plan, Title I at §§ VI. D.(1) and E.(1).

42.     DuPont charges participants a "cost" for the additional payment that the SBO provides to the surviving spouse, which "is paid for by a reduction to your monthly pension payment." SPD at 17.

43.     The Plan also offers "joint and survivor options" (JSOs) that participants can select in conjunction with the SBOs.  SPD at 18.  Eligible participants can select a JSO in "any multiple of 10% of [the participant's] calculated pension as long as the sum of all survivor benefits does not exceed [the participant's] reduced pension."  SPD at 18. In other words, the total survivor percentage provided by the CPSB, SBO and any JSO must be less than 100%.

14

44.     To calculate the cost of benefit that the SBOs and JSOs provide, Defendants use "investment return rates" in Appendix A and the tabular factors in Appendix D.  Plan, Title I, § VI.D(9).  Appendix A provides that the "investment return rate will be established quarterly" using an external index, rounded to the nearest whole percentage and subject to a 5% minimum and a 15% maximum.  Plan, Title I at Appendix A.

45.     Appendix D has separate tables of reduction factors based on the ages of the spouse and participant for each whole number interest rate between five and fifteen percent. The factors in Appendix D represent the percentage by which the participant's SLA is reduced to a provide a survivor annuity "equal to 10% of the employee's unreduced pension," *i.e.*, the participant's SLA at BCD.  *Id.*  For example, if the participant's SLA is $1,000 a month and the applicable factor in Appendix D is 3, the participant's pension is reduced by 3%, to $970 a month, and the participant's spouse would be entitled to receive a survivor benefit of $100 a month after the participant's death.

46.      Appendix D's reduction factors are applied so that the resulting survivor annuity, *plus* the participant's CPSB, provide the spouse with a survivor's annuity that is equal to either 50% or 75% of the monthly payment received during the participant and spouse's joint lives.  As DuPont describes:

> The **combination** of the Spouse Benefit Option payment **and** the Company-Paid Survivor Benefit will provide a total survivor benefit at the level (50% or 75%) that you choose.  The cost of the Spouse Benefit Option is reflected in the amount that you will receive each month.

DuPont's Pension Option Descriptions. (emphasis added).[5]

47.     The 50% SBO is the Plan's default form for married participants.   But participants can choose another form without their spouse's consent if "spousal consent is otherwise not required by regulations issued by the Secretary of Treasury."  Plan at Title I, § VI.D(4).

48.     Under the Plan, married participants do not have to provide their spouse's consent if they select an SBO.  As DuPont describes, "Qualified Joint and Survivor Annuity is a legal term" and any "form of payment" that provides a "Spouse Benefit Option' also meet[s] the requirements of a Qualified Joint and Survivor Annuity."  DuPont's Notice of Rights.

## II.    The SBOs Do Not Satisfy ERISA's Actuarial Equivalence Requirements

### A.    Actuarial Assumptions Used to Determine Actuarial Equivalence Must Be Reasonable

49.     As discussed above, to compare the present values of two benefit options offered to a plan participant at the time she begins collecting benefits, it is necessary to determine the present values of the ***aggregate*** (*i.e.,* total) future benefits the participant (and, if applicable, the beneficiary) is expected to receive under each form using actuarial assumptions that are reasonable as of that date. There are two main components of these

---

[5] DuPont's Pension Option Descriptions further provides: "If you are married and you choose a Pension Benefit with Spouse Benefit Option form of payment, your spouse…will be your beneficiary for ***both*** the spouse Benefit Option as well as the Company-Paid Survivor Benefit.  This spouse continues to be your survivor for ***both benefits*** as long as he or she survives."  (Emphasis added).

present value calculations: (1) an interest rate and (2) the mortality table applied to participants and beneficiaries.

50.     An interest rate is used to determine the present value of each future payment. This is based on the time value of money, meaning that money available now is worth more than the same amount in the future due to the ability to earn investment returns.  The rate is often called a "discount rate" because it discounts the value of a future payment.  *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 338 F.3d 755, 759 (7th Cir. 2003).  ("A discount rate is simply an interest rate used to shrink a future value to its present equivalent.").

51.     The interest rate used by a defined benefit plan to calculate present value must be reasonable based on prevailing market conditions, which "reflect anticipated events." *See* 29 U.S.C. § 1002(27).  The interest rate may be broken into segments of short-term, medium-term and long-term expectations pertaining to each future payment. *See, e.g.*, ERISA §§ 205(g)(3)(B)(iii) and 303(h)(2), 29 U.S.C. §§ 1055(g)(3)(B)(iii) and 1083(h)(2).

52.     As alleged above, under § 3.6 of ASOP No. 27,[6] "each economic assumption used by an actuary should be reasonable."[7] An assumption is deemed "reasonable" if it "takes into account historical and current economic data that is relevant

---

[6] Courts look to professional actuarial standards as part of this analysis. *See, e.g. Stephens*, 644 F.3d at 440 (citing Schwartzmann & Garfield); *see also McDaniel*, 203 F.3d at 1110 (citing American Academy of Actuaries' publication).
[7] Available at: https://www.actuarialstandardsboard.org/asops/selection-economic-assumptions-measuring-pension-obligations/

as of the **measurement date**," and "reflects the actuary's estimate of future experience." *See* ASOP No. 27, § 3.6 (emphasis in original).  The Treasury Interest Rates are reasonable because they are updated to reflect current economic conditions.

53.   A mortality table is a series of rates which predict how many people at a given age will die before attaining the next higher age.

54.   More recent mortality tables are "two-dimensional" in that the rates are based not only on the age of the individual but the year of birth.  The SOA, an independent actuarial group, publishes the mortality tables that are the most widely used by defined benefit plans when doing these calculations.  The SOA published mortality tables in 1971 (the "1971 GAM"), 1976 (the "UP 1984"), 1983 (the "1983 GAM"), 1994 (the "1994 GAR"), 2000 (the "RP-2000"), 2014 ("RP-2014"), and 2019 (the "Pri-2012") to account for changes to the population's mortality experience.

55.   Since at least the 1980s, the life expectancies in mortality tables have been on an upward trend as shown below:



Source: Aon Hewitt, *Society of Actuaries Finalizes New Mortality Assumptions: The Financial and Strategic Implication for Pension Plan Sponsors* (November 2014), at 1. According to this paper, there have been "increasing life expectancies over time" and just moving from the 2000 mortality table to the 2014 table would substantially increase projected morality and, therefore, increase pension liabilities by 7%.

56.     Life expectancies in the Pri-2012 mortality table, which the SOA published in 2019, remained consistent compared to those in the RP-2014 mortality table.

57.     Under § 3.5.3 of ASOP 35, mortality tables must be adjusted on an ongoing basis to reflect improvements in mortality.[8]

58.     Accordingly, in the years between the publication of a new mortality table, mortality rates are "projected" to future years to account for expected improvements in mortality.[9]  For example, the Treasury Mortality Table in 2018 was the RP-2014 mortality table adjusted for mortality improvement that had occurred since 2014. IRS Notice 2017-60-50.[10]  The Treasury Mortality Table in 2019 was the RP-2014, projected with another year of mortality improvement.  IRS Notice 2018-02.[11]

59.     For purposes of the present value analysis under ERISA, the mortality table must be updated and reasonable "to reflect anticipated events." 29 U.S.C § 1002(27).  The

---

[8] Available at: www.actuarialstandardsboard.org/asops/selection-of-demographic-and-other-noneconomic-assumptions-for-measuring-pension-obligations/#353-mortality-and-mortality-improvement

[9] Life expectancies with a projection scale assume a generational projection of future mortality improvements (i.e., life expectancies increase with year of birth).

[10]  Available at: www.irs.gov/pub/irs-drop/n-16-50.pdf.

[11]  Available at: www.irs.gov/pub/irs-drop/n-18-02.pdf

Treasury Mortality Tables are updated to reflect recent mortality data from participants in private pension plans. 26 C.F.R. § 1.417(a)(3)-1(c)(2)(iv).   Accordingly, the Treasury Assumptions are reasonable.

60.     Using a reasonable interest rate and mortality table, the present values of the SLA and the other forms of benefit can be compared to determine whether those forms of benefit are actuarially equivalent.  Pension plans must use reasonable interest rates and mortality tables to evaluate whether the present values of benefit options produce actuarially equivalent benefits for participants and beneficiaries.

**B.      The Plan's Formulae Do Not Produce Actuarially Equivalent SBO Benefits in Violation of ERISA.**

**1.      The "Cost" that DuPont Charges Participants for the SBO is Too High.**

61.     The benefits payable to the surviving spouse under the Plan are a combination of the CPSB and the SBO, which is "an additional monthly payment."  Benefit Packet.  The "cost" of the SBO, this additional monthly payment for the surviving spouse, "is paid for by a reduction to [the participant's] monthly pension payment."  SPD at 17. Simply put, DuPont charges participants too much for an SBO.

62.     Actuarial equivalence should be "cost-neutral," such that the reduction to the monthly SLA payment should accurately measure the likelihood that the spouse will receive future payments (i.e., outlive the participant) and the projected value to the participant and cost to the sponsor of the additional monthly payments.  The tabular factors in Appendix D that DuPont uses to calculate SBOs are not cost neutral because they

provide too little value to participants at too little cost to DuPont. Moreover, they are materially different from factors generated by reasonable actuarial assumptions.

63.     During all relevant times, DuPont uses tabular factors using a 5% discount rate and the tabular factors in Appendix D to calculate SBOs (and any JSOs).[12]   The Plan does not expressly state the mortality table that was used to generate the factors in Appendix D.   However, the Plan's definition of "actuarial equivalence" provides that benefit calculations are performed using the "mortality rates for pensioners and for survivors using, respectively, the 1985 DuPont Pensioner Mortality Table and the 1985 DuPont Survivor Mortality Table."  Plan, Title I at § IX, A(5)(b).

64.     Appendix D's tabular factors are consistent with those generated by the 1971 GAM mortality table.  The 1971 GAM was published in 1971 and reflects mortality data from the 1960s for participants in group annuity plans.  Mortality rates have significantly declined since the 1960s (i.e., people are living longer).  By using tabular factors based on outdated, unreasonable actuarial assumptions, Defendants decreased the present value of participants' benefits and lowered the monthly benefits payable during the participant's and the spouse's lives.

65.     Participants receiving SBOs are harmed by Appendix D's excessive reduction factors.  The reduction factors in Appendix D are ***substantially higher*** (i.e., worse for participants) than those generated using reasonable actuarial assumptions such

---

[12] The tabular factors in Appendix C provide the maximum reduction factor that can be applied to calculate a 50% SBO.  Appendix K's factors provide the maximum factor for a 75% SBO.  Both factors

as the applicable Treasury Assumptions. While the amount of the loss suffered will vary depending on the ages of the participant and beneficiary and the form of benefit, each participant who selected an SBO is receiving less than an actuarially equivalent benefit because the formula that Defendants used to calculate SBOs – Appendix D – applies excessive reduction factors.

### 2. DuPont Used, and Regularly Updated, the Actuarial Assumptions Used to Calculate the Plan's Liabilities

69.     DuPont has sponsored the Plan during all relevant times. For purposes of its filings with the U.S. Securities and Exchange Commission ("SEC"), DuPont or its parent company used reasonable, contemporary actuarial assumptions to calculate the present value of its benefit obligations under the Plan.  Specifically, DuPont's audited financial statements are prepared in accordance with the Generally Accepted Accounting Principles ("GAAP"), pursuant to which actuarial assumptions must reflect the "best estimate" for those assumptions as of the current measurement date.[13]

---

[13] For example, as noted in a "Financial Reporting Alert" by Deloitte:

> This publication highlights some of the important accounting considerations related to the calculations and disclosures entities provide under U.S. GAAP in connection with their defined benefit pension and other postretirement benefit plans.
>
> ***
>
> **Mortality Assumption**
>
> …Frequently, actuaries recommend published tables that reflect broad-based studies of mortality.  Under ASC[13] 715-30 and ASC 715-60, *each assumption should represent the "best estimate" for that assumption as of the current measurement date*. Entities should

70.     During all relevant times, DuPont and its parent company used reasonable mortality tables to calculate its pension liabilities. For example, DuPont immediately started using the RP-2014 mortality table to measure its pension liabilities after the SOA released it in October, 2014.  DuPont's Form 10-K for the year ending December 31, 2014, provides:

> In October 2014, the Society of Actuaries released final reports of new mortality tables and a mortality improvement scale for measurement of retirement program obligations in the U.S. The company has adopted these tables in measuring the 2014 long term employee benefit obligations. ***This adoption has increased the benefit obligation at December 31, 2014 by approximately $1.7 billion***.[14]

71.     In 2017 and 2018, when a subsidiary of DowDuPont, DuPont adopted the SOA's most recent mortality improvement scale (e.g., the MP-2017 in 2017, etc.) to calculate Plan liabilities.[15]  In 2019, when a subsidiary of Corteva, DuPont began using the Pri-2012 mortality tables to calculate the Plan's year-end liabilities, which the Society of Actuaries had released earlier that year.[16]

72.     In sharp contrast to DuPont's regular updates of the mortality assumption used to calculate Plan liabilities, DuPont continued to use Appendix D's excessive

---

> consider whether the mortality tables used and adjustments made (*e.g.*, for longevity improvements) are appropriate for the employee base covered under the plan.

Deloitte, Financial Reporting Considerations Related to Pension and Other Postretirement Benefits, Financial Reporting Alert 21-3, December 3, 2021, at 6 (emphasis added).
[14] 2014 Form 10-K at p. 35 (Emphasis added).
[15] Plan Form 5500 at XX.
[16] Plan Form 5500 for year ending December 31, 2019, at 33 of 105.

reduction factors that were based on an outdated, unreasonable mortality assumption to calculate participants' actual benefit amounts.

73.    DuPont's methodology for selecting the discount rate to calculate the actuarial present value of Plan benefit obligations for accounting purposes also reflected current economic conditions. During all relevant times, DuPont used "the yields of high-quality corporate fixed income investments at the measurement date" to perform this calculation.[17]

74.    Throughout the relevant period, for purposes of its financial statements, DuPont used actuarial assumptions to calculate a greater liability for the benefits the Plan would owe to participants that were updated and reasonable compared to those used in the formulae for determining the SBO benefits that were actually paid to participants. There is no legitimate justification for Defendants to use the Plan's antiquated formula, which excessively reduced participants' benefits, while at the same time using up-to-date, reasonable actuarial assumptions that reflect the contemporary conditions for projecting benefit costs in annual financial reporting. Because these two analyses — determining Plan liabilities and determining Plan benefits actually paid to participants — measure the payment of the same benefit streams over the length of the same lives, they should be determined using the same actuarial assumptions.

75.    "ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit . . . 'If plans were free to

---

[17] Corteva's Form 10-K for year ending December 31, 2019, at F-69; *see also* DuPont's Annual Report for year ending December 31, 2016 at 42.

determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence.'" *Laurent v. PriceWaterhouseCoopers LLP*, 794 F.3d 272 (2d Cir. 2015) *quoting*, *Esden v. Bank of Boston*, 229 F.3d 154, 164 (2d Cir. 2000). The Plan's formulae for determining SBO benefits do ***not*** reflect "characteristics that are typical of the plan's participants." *McDaniel*, 203 F.3d at 1110.

76.     During the relevant period, Defendants used the fixed reduction factors in Appendix D, based on antiquated and unreasonable actuarial assumptions, to generate SBO benefits that were lower than the factors generated by reasonable actuarial assumptions. Had the Plan used factors based on reasonable actuarial assumptions, such as the Treasury Assumptions or the assumptions that DuPont used to calculate the Plan's liabilities, Plaintiff and the Class would have received, and would continue to receive, actuarially equivalent benefits that are greater than the benefits they currently receive.

77.     Discovery will likely show that Defendants' use of unreasonable factors to generate SBO benefits deprived retirees and their spouses of tens of millions of dollars.

78.     Plaintiff James Manning started receiving benefits at age 66 when his wife was age 63.  He selected a 75% SBO with a 10% JSO, which pays $6,451 a month. Defendants calculated his benefits by reducing the SLA he was offered, $7,952.10, by the excessive reduction factor in Appendix D that applied to him and his spouse.  The benefit produced by the Plan's formulae is substantially lower than compared to those produced by reasonable actuarial assumptions. For example, using the reduction factor produced by the Treasury Assumptions that were current when he retired, Mr. Manning's benefit would

be $7,115.38 per month, $664.38 more than he is currently receiving, an increase of 10.3%. By using Appendix D's excessive reduction factors, Defendants reduced the present value of Mr. Manning's pension benefits by more than $115,039.

79.     Because his benefits were calculated using formulae that excessively reduced his SLA benefit compared to the corresponding SBO payment, Plaintiff has been harmed. He is receiving less each month than he would have received if the Plan used reduction factors based on reasonable, up-to-date actuarial assumptions, like ERISA requires. Plaintiff, along with each other Class member, has been substantially damaged by receiving benefits below an actuarially equivalent amount in violation of ERISA.

80.     In short, Defendants failed to provide joint and survivor annuities that were actuarially equivalent to the SLA that participants were entitled to receive when they retired as required by ERISA § 205(d), 29 U.S.C. § 1055(d). By using unreasonable formulas based on antiquated actuarial assumptions, Defendants have materially reduced the monthly benefits that participants and beneficiaries under the Plan receive in comparison to the monthly benefits they would receive if Defendants used factors based on updated, reasonable actuarial assumptions.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the Class (the "Class") defined as follows:

> All participants and beneficiaries of the Plan receiving an SBO whose benefits had a present value that was less than the present value of the SLA they were offered using the applicable Treasury Assumptions as of each participant's Benefit Commencement Date. Excluded from the Class are Defendants

and any individuals who are subsequently to be determined to
be fiduciaries of the Plan.  Also excluded from the Class are
participants and beneficiaries receiving an SBO in conjunction
with the Plan's Income-Leveling Option.

82.     The members of the Class are so numerous that joinder of all members is

impractical.   Upon information and belief, the Class includes thousands of persons.

According to the Plan's most recent Form 5500, there are over 55,387 retired participants

receiving benefits.

83.     Plaintiff's claims are typical of the claims of the members of the Class

because Plaintiff's claims, and the claims of all Class members, arise out of the same

policies and practices as alleged herein, and all members of the Class are similarly affected

by Defendants' wrongful conduct.

84.     There are questions of law and fact common to the Class and these questions

predominate over questions affecting only individual Class members.  Common legal and

factual questions include, but are not limited to:

A.     Whether the Plan's formulae provide benefits for participants
receiving an SBO that are actuarially equivalent to the SLA
participants could have selected;

B.     Whether the Plan's formulae for calculating SBO benefits are
reasonable;

C.     Whether Plaintiff and Class members should have their benefits
recalculated to conform with ERISA's actuarial equivalence
requirements; and

D.     Whether Plaintiff and Class members should receive payments to compensate them for past and future benefit payments that did not and will not satisfy ERISA's actuarial equivalence requirements.

85.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions.  Plaintiff has no interests antagonistic to those of other members of the Class.  He is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

86.     This action may be properly certified under either subsection of Federal Rule of Civil Procedure 23(b)(1).  Class action status is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

87.     In the alternative, certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

88.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under Rule 23(b)(3) is appropriate because the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**FIRST CLAIM FOR RELIEF**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

89.     Plaintiff re-alleges and incorporates by reference all prior allegations in this Complaint.

90.     Defendants have improperly reduced SBOs for participants and beneficiaries of the Plan below the amounts that they would receive if those benefits were actuarially equivalent to an SLA in violation of ERISA § 205(d), 29 U.S.C. § 1055(d).

91.     As a result, Defendants have caused a forfeiture of benefits for participants and beneficiaries of the Plan in violation of ERISA § 203(a), 29 U.S.C. § 1053(a).

92.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

93.     Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the methodologies used by Defendants for calculating SBOs violate ERISA because they do not provide an

actuarially equivalent benefit, as required by ERISA § 205(d), 29 U.S.C. § 1055(d), and deprived Plaintiff of his vested benefits in violation of ERISA § 203(a), 29 U.S.C. 29 U.S.C. § 1053(a).

94.     Plaintiff seeks an order from the Court providing a full range of equitable relief, including but not limited to:

      (a)     re-calculation, correction, and payment of SBOs benefits previously paid under the Plan;

      (b)     an "accounting" of all prior benefits and payments;

      (c)     an equitable surcharge;

      (d)     disgorgement of amounts wrongfully withheld;

      (e)     disgorgement of profits earned on amounts wrongfully withheld;

      (f)     a constructive trust;

      (g)     an equitable lien;

      (h)     an injunction against further violations; and

      (i)     other relief the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty
### (ERISA §§ 404 and 502(a)(3), 29 U.S.C. §§ 1104 and 1132(a)(3))

95.     Plaintiff re-alleges and incorporates by reference all prior allegations in this Complaint.

96.     The Committee is a named fiduciary of the Plan.

97.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform

fiduciary functions. Thus, a person is a fiduciary to the extent that person "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. As such, neither "named fiduciary" status, nor formal delegation is required for a finding of fiduciary status, and contractual agreements, such as the governing Plan documents, cannot override a finding of fiduciary status when the statutory test is met.

98.    The Committee and its members are fiduciaries for the Plan because throughout the Class Period they have been named fiduciaries of the Plan, and/or exercised discretionary authority or control respecting the management of the Plan, and/or exercised authority or control over the management or disposition of the Plan's assets, and/or have had discretionary authority or discretionary responsibility in the administration of the Plan. Among other things, during the Class Period, the Committee had authority or control over the determination of the amount and payment of benefits from the Plan.

99.    DuPont is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or control with respect to the management of the Plan, and/or exercised authority or control over management or disposition of the Plan's assets, and/or has discretionary authority or

discretionary responsibility in the administration of the Plan, including, but not limited to, its duty to appoint and monitor members of the Committee.

100.   ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) requires Defendant-fiduciaries to discharge their duties with respect to the Plan "in accordance with the documents and instruments governing the plan[s] insofar as such documents and plan instruments are consistent with" ERISA.

101.   The Plan's terms are not consistent with ERISA because the Plan uses unreasonable formulae to calculate SBOs that do not provide actuarially equivalent benefits.  As a result, participants and beneficiaries do not receive actuarially equivalent benefits, like ERISA requires, and lose vested benefits in violation of ERISA.

102.   Here, Defendants breached their fiduciary duties by following the Plan terms which violate ERISA because those terms result in participants receiving less than the actuarial equivalent of their vested accrued benefits.

103.   ERISA further imposes on fiduciaries that appoint other fiduciaries the duty to monitor the actions of those appointed fiduciaries to ensure compliance with ERISA.  In allowing the Committee to pay benefits that were not actuarially equivalent, in violation of ERISA, Defendant DuPont breached its fiduciary duty to supervise and monitor the Committee.

104.   As a direct and proximate result of the Defendants' fiduciary breaches, participants in the Plan have lost, and are continuing to lose, millions of dollars in vested accrued pension benefits.

105.   Defendants are jointly liable for the acts of the other as co-fiduciaries for the Plan.

106.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

107.   Pursuant to this provision, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks declaratory relief, determining that the Plan's established methodologies for calculating SBOs do not provide actuarially equivalent benefits because they do not provide benefits with an equal present value to the SLA as required under ERISA.

108.   Plaintiff further seeks orders from the Court providing a full range of equitable relief including but not limited to:

(a)   re-calculation, correction, and payment of actuarially equivalent JSA and QPSA benefits previously paid under the Plan;

(b)   an "accounting" of all prior benefits and payments;

(c)   an equitable surcharge;

(d)   disgorgement of amounts wrongfully withheld;

(e)   disgorgement of profits earned on amounts wrongfully withheld;

(f)   a constructive trust;

(g)   an equitable lien;

(h)     an injunction against further violations; and

(i)     other relief the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certify Plaintiff as Class representative;

B.     Declare that the Plan has failed, and continues to fail, to properly calculate and pay SBO benefits that are actuarially equivalent to the SLA, in violation of ERISA;

C.     Order Defendants to correct and recalculate SBO benefits that have been paid under the Plan;

D.     Order Defendants to provide an "accounting" of all prior payments of SBO benefits under the Plan to determine the proper amounts that should have been paid;

E.     Order Defendants to pay all benefits improperly withheld, including under the theories of equitable surcharge and disgorgement;

F.     Order Defendants to disgorge any profits earned on amounts improperly withheld;

G.     Impose a constructive trust;

H.     Impose an equitable lien;

I.     Order Defendants to pay future benefits in accordance with ERISA's actuarial equivalence requirements;

J.      Award, declare, or otherwise provide Plaintiff and the Class with all relief available under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that the Court deems proper;

K.      Award to Plaintiff's counsel attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

L.      Any other relief or remedy the Court determines is just and proper.

Dated: March 13, 2023

Respectfully submitted,

 /s/ *Carmella P. Keener*
Carmella P. Keener, Esquire
**COOCH AND TAYLOR, P.A.**
ckeener@coochtaylor.com
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
(302) 984-3816
ckeener@coochtaylor.com

**IZARD, KINDALL & RAABE LLP**
(*pro hac vice* applications forthcoming)
Robert A. Izard
Douglas P. Needham
Christopher M. Barrett
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: (860) 493-6292
rizard@ikrlaw.com
dneedham@ikrlaw.com
cbarrett@ikrlaw.com

***Counsel for Plaintiff***